Good morning. May it please the Court, Grant Willis on behalf of Petitioner Laura Arzumanyan. Your Honours, the immigration judge made several clear errors in denying Ms. Arzumanyan's asylum application on the basis of adverse credibility. Ms. Arzumanyan's final years in Armenia were a time of political uncertainty, instability, and suspicion. They were a time in which political dissidents, real and perceived, faced the real possibility of extra-legal persecution and punishment by Armenia's domestic security forces, including those within the Ministry of Internal Affairs. In this environment, Ms. Arzumanyan nonetheless spoke out about causes and affiliated with organizations that challenged the ruling government's policies and conduct. For this, she paid a price. Ms. Arzumanyan testified, through a translator, about three core events, which included multiple instances of beating, abduction, and imprisonment by agents acting on behalf of the Ministry of Internal Affairs in Armenia. The potential problem is that she didn't testify the same way about those events each time, did she? And I'd like to focus your attention on one particular element. Can you explain to me why it is that in her written declaration, she gave a story somewhat different than she gave concerning in her testimony concerning what happened, what I'll call the second set of episodes. I'm sure you know what I'm getting to. In her declaration, she appeared to speak explicitly about beatings. I was beaten several times during my 15-day detainment. That's a quote from the declaration, the English language version. During her testimony, she was explicit in saying she was beaten before she was incarcerated, but was not beaten during the 15 days she spent in detention. How do you explain the difference? Judge Clifton, I think the way that we must look at that inconsistency that came from the change in testimony, the judge, the immigration judge, when looking at the inconsistency, was required to determine whether the inconsistency bore on her credibility. And as a matter of law, I would submit that she could not have done that. I would expect someone to remember. Why doesn't it bear on credibility? My reading of the transcript, Judge, shows that Ms. Arzumanian never equivocated from her testimony that she was beaten only once. And this was, as Your Honor stated, during the October-November 2000 incident, the second set of incidents, if you will, when the government attorney called to Ms. Arzumanian's attention that, in fact, she had previously signed a translated declaration in which she stated that she had been beaten multiple times, she said, no, that is not right. And it is unclear why that was not right. And what she said was, I have not looked at it that way. It appears quite likely that it is similar to this Court's decisions in cases like Garogios and other cases, where a petitioner, upon testifying, changes their testimony because they were either unaware of something that was in their written statement, and I think it's important to bear in mind that her testimony was translated, her statements were translated. I don't think it's strange credulity to imagine that she would have overlooked something, English not being her native language, would have overlooked something in the translation like that. I think the legal point to bear in mind is that this did nothing to enhance her claims of persecution. And she had no reason to disavow the statements in her previous, her previous explanation in the statement that she was beaten multiple times, except to tell the truth. And, in fact, it's a far cry... To try to give an explanation for why she hadn't told a consistent story. That's always a possibility, Your Honor. I mean, she was asked about, at the hearing, she was asked about the discrepancy. And her answer was, I don't know. And she was asked, well, at the very beginning of the hearing, part of her transcript, she's asked if there's, the statements are admitted into evidence. She's asked if there's anything that's untruthful and so forth. She didn't identify anything that's untruthful. It's true, she was very explicit during her testimony, and that's the point to be considered in her favor. But we still have the question of how is it that it's so jarringly different from what she said in the written statement. And she offers no explanation. In some cases we hear stories about, well, I told my story and then somebody else wrote it up, but I really wasn't responsible for it. But we didn't get that here. I would offer two points. One, I think there may have been an explanation that the immigration judge could have brought out. What she did say is, I hadn't noticed that. I think that that can be reasonably read to imply that she had not read or had not adequately read this portion of her statement. I think the more important point is that if you compare this to cases like Gatterveel's, and in Gatterveel's, in his statement, he said that he had been shot at. Testifying, he said he hadn't been shot at, even in that case. And this was not a, and I would, and so I guess this goes to Your Honor's representation, that this was some sort of drastic change. I would submit that it's not. There was no question she was abducted. There was no inconsistency about the fact that she was in prison. The only inconsistency was about how many times she was beaten, not whether she was beaten. And whether she was beaten before she was taken to the cell. I mean, her story in the written application is that, I read the sentence before, I was beaten several times during my 15-day detainment. Her story given live to the immigration judge was I was beaten by Mr. I can't clearly pronounce his name, so I won't try. Mr. Pulsini. And then I was taken to the cell by other men. And, in fact, her testimony at the hearing was at that time she was at least twice, I guess, taken to the hospital for medical treatment. So it's either before or during her incarceration in the cell. And that does seem to be a different story. There's no question that there was a change in testimony, Your Honor. I would submit that it's not perhaps as drastic as that. It all occurred within the same facility, whether in the cell or in Mr. Yepis Kapulski's office, I don't think is a major point as to her story. And I think this is a far cry from the types of decisions, like the Cower decision, in which there were multiple inconsistencies on a variety of topics and where there was at least some indication that there was intention, in fact, admitted intention, in the case of the Cower decision, to deceive. There's no indication here, as I read the transcript, Your Honor, that Ms. Arzumanian intended to deceive. The indication that I see is that she intended to correct her testimony to make it accurate so that the immigration judge could base it thereon. And in that circumstance, this Court has held that it is not an adequate basis for the immigration judge to render an adverse credibility determination. With the remaining time I have before I say for rebuttal, Your Honor, I would note the two other instances, one in September of 1999, the other in July of 2002. And for neither of those, did the immigration judge give a cogent or reasonable explanation for finding her not credible. In the 1999 instance of persecution, she substituted speculation, her speculation, judging what she thought the government should have done or would have done, judging what sort of injuries she imagined Ms. Arzumanian would have sustained. And even though Ms. Arzumanian said she did not receive medical attention, the judge nonetheless demanded evidence of that medical attention. Clearly that's improper. And contrasted against the July 27, 2002 instance of persecution, where she did produce medical evidence that she had broken her finger after a beating, and the judge, in short, said, I don't believe this corroborated evidence because I don't believe you. And so there's this unreasonable circularity, illogical circularity to the rationale that I don't think is adequate to base an adverse credibility determination. And I will reserve the rest of my time for rebuttal. You may, and we'll hear from the representative of the Attorney General. Good morning. Scott Rompel on behalf of the Attorney General. May it please the Court. This is a case about an alien who presented an asylum claim that was not credible. An alien who created a story around events, around circumstances that might have taken place, such as the fact that she was a librarian and that her son got kicked out of school and that perhaps she had some medical ailments. But the story that she tried to create around these events was reasonably found by the immigration judge not to be credible for no less than a dozen reasons, more than I could possibly. Yeah, but a good number of those reasons are tough to sustain. Maybe you should focus on those reasons that you think are sustainable. Well, certainly the one that Your Honor pointed out before would be one that would be sustainable for the reasons that you stated, inconsistencies related, referring to the 2000 event, to when she was beaten, who beat her, the number of times. What do we do with our precedent that seems to indicate that if it doesn't enhance the story? And here's the difference between a beating and beatings. Certainly her counsel had an opportunity to blame that on errors in translation, which they did not. And she explains it, doesn't attempt to explain it in any way as an error in translation, simply says, no, I was just beaten once. Now I'm not sure what beating once means as opposed to being beaten several times. If you're hit several times with fists, that could be one beating, or you might have been beaten several times. If you're beaten over a course of days, that's the kind of thing that we might think would be beatings. Well, certainly the number of times that she was beaten was one issue, but it goes much broader than that because it also has to do with where she was. How did it enhance her credibility? I'm sorry, what was that? The test is, did her second statement go to a claim? Did it enhance her credibility? Right. And that's why I presented to the court in a 28-J letter the case of Carr, because it didn't technically enhance the claim, but it was an example, just as in Carr, where although you had a situation where it doesn't technically enhance the claim, there's aspects of the particular inconsistency that make it quite probative of truthfulness. So in addition to the ones that Your Honor has pointed out related to the severity of the beatings and the number of times she was beaten, there were also very, very specific memorable events that she had. Well, let's stick to the one we're talking about. Yes. How did this, you haven't answered my question, how did the change enhance her credibility? What I said, Your Honor, is that it didn't technically enhance her credibility. All right, it didn't technically, it didn't. You can answer yes or no, it did not. It did not enhance her credibility. No, it did not. It did not enhance. It did not enhance her claim. Go ahead. Sure, and the government concedes that, but it was, that's why Carr, that case was pointed out, because it didn't enhance the claim in that case either, but there were other indica of unreliability. And I would point the court to the declaration of 2002, where she said, the district chief visited me in my cell. I shivered as soon as I saw him.  But she recalled a specific memorable, her state of mind at the particular time, that when she, somebody approached her in her cell, she actually shivered. And then she knew what was going to happen. So it goes beyond simply where she was. And that point would also be relevant because whether somebody is getting beaten in somebody's office or whether they're getting beaten in a prison cell, again, is something that is a specific memorable event. So it has all the indicia of unreliability that was presented in Carr. So regardless of, as Your Honor pointed out, that it doesn't technically enhance the claim, the question is, in the broader sense, even though you have a general principle of an inconsistency needing to enhance a claim, does somebody who provides such drastic distinctions in their versions, was the immigration judge warranted in finding that somebody who presents these inconsistencies is not telling the truth? Was it a reasonable inference? And the government would contend that it is. So that would certainly be one example related to the October 30th, November 15th, 2000 incident. And to move on to a few others, another important one was her failure to have her daughter testify. And this is directly on point to the case of Sidu v. Ines at 220 F3rd, 1085, that was also brought to this Court's attention in a 20HA letter. And the reason that this is important is because she has a relative who supposedly witnessed events that took place in Armenia who lives or lived at the time of the immigration hearing in Sacramento. What events would the daughter have witnessed? The daughter would have witnessed the first incident, the one that took place in 1999. And not only would the daughter have How would the daughter have witnessed it? I mean, the daughter wasn't present. There's no testimony that the daughter went to the Interior Affairs Office. That's correct. And I, to explain what I meant by that, not that she would have witnessed the actual beating itself, but the petitioner testified during her hearing that after that beating, after the alleged beating when she walked home with her husband, there were several family members who were waiting for her in the house. And one of the people who she says was waiting for her was her daughter. And that's in the record on page 105 at line 25. So she did state that her daughter, among other family members, were actually there and would have been present. You know, I've heard a lot of immigration cases. I can't remember one where failure to call a possibly relevant witness went to the credibility of the petitioner. Well, what the court said in C.D.U.V.I.N.S. was essentially that an immigration judge is entitled to draw adverse inferences from the fact that if a witness is available to testify and lives close, that it is reasonable to infer that the reason that this individual was not called is because they would have provided different testimony. That is what this court said in C.D.U.V.I.N.S. And in addition to the corroboration issue on this point, there was also another problem related to corroboration and credibility concerning her media activities. Because at one time she said, and this is on page 163 of the record, that I have a number of articles printed there, meaning in Armenia, but without my name mentioned because I was afraid, always afraid to mention my name. But of course this flies directly in the face of the fact that at least on two occasions she stated under oath in the record that she appeared on television and gave interviews. So it would fly in the face of her argument that somehow she can't submit information that has her name on it simply because she was trying to keep a low profile when her entire claim is based on the fact that she was speaking out. Her entire claim was based on the fact that she was speaking out about her political opinions. But it's not inconsistent to say I wrote anonymous articles and I also appeared under my own name in interviews on TV. I mean, those are two different events. You may choose for some reason not to give your name. But that doesn't make your testimony inconsistent. It's not an inconsistency, but it does give an indica of unreliability. And the reason is that when she said that she doesn't have articles because they weren't in her name, that was actually her explanation to the question of, well, do you have any corroboration? So her explanation, the reason that she was providing in order to explain why there was a lack of record evidence on this point, itself put into It's easier to produce a written record of newspaper articles than it may be to provide evidence off of a TV interview. Right. And that's because the point was corroboration related to the nobody asked for corroboration for the television. It was corroboration related to, well, do you have any articles? So the fact that her explanation itself flies in the face of her claim in general, which essentially is that I was appearing on TV. They know who I am. I'm expressing my political opinion. That is another reason, in addition to about ten others, why the immigration judge reasonably found that she was not Don't exaggerate. Ten others. Yes, Your Honor. A number of them are pretty Let me just be frank with you. The impression is of a nitpicking I.J. who didn't want to believe her. And to say there are all these other things is very unimpressive coming from you. Well, certainly, I mean, it's not my personal opinion. I mean, the record does state 12. And if Your Honor believes that some of them aren't correct, I would just submit that the record doesn't compel the conclusion for the vast majority of them, at the very least, that there are actual reasons why and legitimate ones. And there's no indication that the immigration judge was biased. Let me take an easy example. All the stuff about the son, I have difficulty understanding how her testimony about her son impacts negatively upon her credibility. It's cited at some length, but I don't understand the connection. I think it was a corroboration issue, Your Honor. Essentially what the immigration judge is saying is and it goes to the bigger picture of events that did actually happen, her trying to build a claim around it. So, for example, perhaps the son actually did get kicked out of school. And the whole point is, why? And you produce all this information saying he was kicked out of school, and you say it was because he didn't get good grades. But you don't produce any evidence, and don't give any explanation as to why it couldn't be provided, stating that he got A grades. She just wants the court to infer, based on the information that she is able to put forward, that somehow that supports her claim, and there's no evidence to support that idea. My son tells me about the great grades he gets in college, too, but I don't know that I could corroborate it. I think he just wants me to believe it. Right, but if Your Honor was attempting to obtain asylum, certainly you would ask your son or daughter, perhaps can I just have a copy of your grades to be able to corroborate that claim. And she does have the burden. The burden is on her to prove that she has a credible asylum claim. So even though that is a small detail, it's one, as the immigration judge said, among cumulatively and individually, that support the decision. And I see that my time is up. So unless the court has any other questions for me, I say thank you. Thank you. We'll hear from the Petitioner's Counsel. Thank you, Your Honors. This case is not Cower or Carver, however it's pronounced, and it's not Sidhu. In the Cower decision, the panel took the eminently reasonable view that the standard rule, the fact that they changed testimony does not enhance the claim, does not need to be a per se rule for IJs to apply rigidly. And in that case, you had a woman who applied for asylum, who lied about her marital status so that her husband could preserve his asylum claims, who lied about other material aspects of her claim. And the only issue that did not, the only change that did not enhance her claim, was the change about whether or not she had been raped. The facts in that case bear no meaningful resemblance to the facts in this case, and neither do the facts in Sidhu, which is the case the government cited in the supplemental brief for the notion that Ms. Arjumanian was required to call her daughter to testify. In Sidhu, the father of the applicant lived close. He was a political leader in India. He was a first-hand witness to some of the persecutions purportedly experienced by his son. In fact, he was the cause of some of the experiences of persecution experienced by his son. And the court found in that case that it would have been helpful, when the father was so central to these asylum claims, to have the father come and testify. I would submit that this case is like neither of those. And for all of the reasons discussed and discussed in the brief, the immigration judge did not reasonably and cogently explain her adverse credibility determination, and her decision should be vacated. Thank you, Your Honors. Thank you. We thank both counsel for the argument. The case just argued is submitted. Could I just add that I mentioned how many immigration cases I've heard. I thought this was particularly well-argued on both sides. So I congratulate counsel on both sides. Thank you, Your Honor. We do appreciate the argument. The next case on the calendar is submitted on the briefs. That's Guillen v. Holder. So we'll move to the next case.
judges: Noonan, Clifton, Bybee